Good morning, ladies and gentlemen. The final case of the morning for oral argument is S. P. v. East Whittier School District. Counsel? Good morning, Your Honor. May it please the Court, my name is David Gray, and I represent S. P. in this matter. California has articulated special factors for when an IEP is being crafted for a child that's deaf. Among these special factors is a requirement making clear that it's essential that the child's preferred mode of communication be developed to an appropriate level of proficiency. There's actually a second statute in California that also says that it is emphasizing how important it is that a deaf child's primary, develop a primary language and be able to master that primary language. Yet another special factor articulated by California is the need for the child to be educated in the regular classroom with non-disabled children to the greatest extent appropriate. That is also known as the least restrictive environment standard. Now, these special factors, they supplement IDEA, and these special factors are the school's mandatory obligation to consider when crafting an IEP. Can you help me understand just sort of the practical implications of the misclassification in this case? Had she been classified, and at the time she was a preschooler, right, three years old, had she been classified as hearing impaired and not just having a speech and language disorder, what would happen? The placement, as the parents asked for, in this special class? As a child eligible under the category of deafness, she would have been entitled to have teachers that were credentialed in deaf and if it was just a classification error alone, and the school did everything else that they were supposed to do to educate a deaf child, it might very well be a harmless error. I think where the district, the administrative law judge, and the district court went astray is her needs as a program was never going to be able to address her needs as a deaf child. And I want to clarify that we're talking about a case where I don't think there's any dispute that this child was deaf. Wait, wait, wait. It's hearing impaired rather than deaf, isn't it? For the purposes of this case, I'm using the term synonymously, but more precisely. Regulation makes a distinction. Whatever the numbers are, 03 I think has to do with deaf and 05 is hearing impaired. And I think this child could meet either one of those categories because she had a difficulty processing linguistic information because of her hearing loss. And where I think everybody went astray is if they had addressed those needs and treated her, again, nobody disputes that this was a child that was deaf. Where the problem arose is the district's insistence on treating her only as though she had a speech and language impairment. And what flows from that is that they neglected her need to develop language to a primary... And so what the school district did was to try to treat intensively the speech and language deficiencies. So if she had been classified as hearing impaired from the get-go, what would have happened? They would have still had to presumably treat the speech and language deficiencies, right, to try to bring her up to what's appropriate at age level. And at this age, it's very developmental. So what sort of services, like, help me understand how things would have proceeded differently had she been classified as hearing impaired? A child who is hearing impaired or deaf will have problems developing language, listening, speaking, and using language because they're not hearing what everybody is saying. So what would the IEP, I think she said, how would that have been different? Had there been the assessment for hearing? An IEP should have placed her in a general education preschool class because what's necessary for these kids is to be immersed in a spoken language environment so they can model their regular education peers, peers that are speaking properly. A child that's deaf or hard of hearing or hearing language, it has to be, for lack of a better word, it's got to be forced down their throat. They have to be immersed and it's got to be a proactive task. And the evidence was actually undisputed at the hearing. Both Ms. Reeder and Ms. Klaus both said that to remediate hearing language problems with a child that is hearing impaired, that they need to be immersed with spoken language, good quality spoken language role models. And that means, are you limiting it to just placement in general education? That's the change that should have been made? That's probably the most important change for a child like SP. Another change would be to have an hour or two hours a week of intensive therapy by somebody that's experienced teaching children with hearing loss how to listen and speak because you have a whole other category of hearing. They have no trouble hearing, but their articulation is off. And the reason why their articulation is off is because they sometimes have trouble placing their tongue in the proper place or moving their mouth in a way that is necessary to properly form the sounds. When you have, there was no evidence whatsoever that type of problem impacted this child. The only evidence was that she had articulation and she couldn't hear. And we hear the way we speak, that's why we have foreign languages, that's why we have regional accents. So if we're not hearing it properly, we're not going to be able to say it properly. And that's the remediation that this child would need to develop the proper speaking, proper use of language through her hearing. And again, that's how we all do it naturally without any thought growing up. We start babbling, then by the age of approximately one we start using simple words and phrases and we're doing that because we heard it. So the IEP for a child like this should have put her in a general education class to give her that language immersion. It should have given her at least an hour a week of individual therapy with somebody who's trained to teach the child how to listen so they can properly speak. And there was testimony in the I'll just ask you one thing here. If I understand your request for relief here, if we decide there are procedural violations, then we remand. We don't have to be resolved by whatever process they're going to follow now with the parents and the school board. We don't decide here if we find a procedural violation. Correct. It should be remanded. District court should then determine relief. For the procedural violation, if I understand this correctly, it doesn't matter whether they weren't classified as hearing impaired or deaf or whatever. Once you find one category, say the language problem, then you're required to examine any others that are brought to your attention, whether they meet that classification or not. So you don't have to find that you're into then it's the duty of the school board to examine any other categories that come to its attention. And your complaint here is, if I understand it, that they didn't do the necessary impairment is usually not how they do in the quiet one-on-one testing room. Most people with hearing impairment will function very well in a one-on-one environment. The problem of somebody like SP and many folks with a hearing disability, how do you function in public? In this particular case, how is she going to function in the noisy classroom environment where she's going to need to hone her skills to really focus on language? And so that label or the classification, it's important because it tells us what we need to do to treat the child's disability. And here, having a child that has the hearing impairment as the disability is going to require one type of treatment, placement in disorder separate and apart from any hearing, which is going to require a different type of treatment. And unless there are any more questions, I've got a little bit of time left that I'd like to reserve. Thank you. Thank you. Good morning, Your Honors. May it please the Court. Jeremy Rickey on behalf of East Whittier City School District, who I'll refer to as district for ease of my speech here. I would like to say this. I'm going to break my presentation down into basically three primary categories. Mr. Gray brought up two special factors in regards to primary communication and the LRE. And I think that I can address those best if I look at the appropriateness of the district's assessments, the relevance of the private environment. Now, in regards to the appropriateness of the... Is your third category one that would only be addressed on remand if we found a procedural violation? As far as the least restrictive environment, Your Honor? Yeah. I believe that there's enough in the... If Your Honors were to find that the least restrictive environment mandate were inappropriately addressed in the district court's decision, I believe that a remand would be appropriate in the sense because SP is no longer in any sort of a remedy that could be crafted at this point. It would be difficult to surmise without current factual findings in regards to her program. Well, we wouldn't craft a remedy anyway under the request, as I understand it, or under the general practice. All we would do if we found procedural violations would be to remand and then the school board and the family would go through a process of working out or with whatever intervention there is under the procedure. They would work out the remedy. So whether she should be in a... What kind of environment she should be in wouldn't be relevant for our purpose. If we found a procedural violation. I don't believe that would be relevant for the court proceedings, Your Honor. Let me concentrate on the first two points. Certainly, Your Honor. That's why I put those first. Absolutely, Your Honor. In regards to the appropriateness of the district's assessments, Mr. Gray and SP have argued primarily that the district's assessments were not appropriate for essentially two primary reasons. One, that there was a failure to do either a functional hearing test or an aided audiogram. And secondarily, that the district failed to identify all of SP's needs to that assessment process. A couple of points that I would make in regards to those is that there's no requirement under IDEA to do a functional hearing test. The obligation is to assess in all areas of suspected disability. Functional hearing test isn't defined in any way, shape, or form. In regards to hearing, the IDEA says that the district is obligated to assess and determine the range, nature, and degree of that hearing loss. There's no reference at all to functional hearing. And once they determine the range, nature, and degree of that hearing loss, to determine how that hearing loss is adversely impacting educational performance. Now, with that said, when it comes to the functional hearing component, which Mr. Gray has proffered here, the private audiologist that assessed at the due process hearing testified that a functional hearing component of the assessment could be satisfied with a speech and language assessment. And here, the district conducted a functional hearing component was satisfied. Now, in regards to whether or not the district properly assessed, or strike that, whether the district properly identified all of the deficits, I think it's important to actually look at the relevance of the private assessments. That's where that comes into play. Now, there's two points that I would make regarding these private assessments. First, is they were non-IDEA compliant. And I think that's very important to keep in mind here. So, these private assessments didn't follow certain procedural requirements that district assessments are required to follow. So, this court and Timotheo stressed the importance of those procedural developmental and academic information in conducting its own assessments. Now, there's other requirements, including reviewing existing evaluation data and classroom-based observations. So, all of these particular pieces are important in developing an educational program. Now, neither Ms. Reeder or Ms. Kloss complied with these assessments, nor did they do any academic testing. So, for lack of a better term, where does the rubber meet the road? How is this hearing loss actually impacting the school district? Does the school district have to do it? No, the school district did do that. But if they did it properly, then you would win, right? Absolutely. So, why do we have to consider what the parents did? Well, that's my point, Your Honor. I don't believe this court should give deference to what the private assessments did because they were language difficulty. If the court were to adopt Mr. Gray and his client's position, that would be correct. Our position is that the district did comply with that mandate by doing the speech and language testing to determine SP's functional hearing. Well, it sounds to me, from reading the records, that they were concentrating solely on the language loss and they were prescribing remedies related to the language loss without treating the hearing loss. Well, in essence, Your Honor, I think when the district reviewed the information, the testimony was that, quite frankly, they were surprised at how well SP had performed. Sarah Carlton, in particular, identified SP's scores on her verbal scores and determined that she was performing, essentially, had made month-for-month progress in regards to her hearing up until that point in time. She wasn't presenting as a child with a hearing loss. She was presenting as a typical child. She had minor articulation deficits, and they attributed that to her hearing loss, and that's why they used the eligibility classification. There was no suggestion of any treatment. They attributed her language problems to the hearing loss. Correct. They didn't either test for the relationship or prescribe any remedy for the hearing loss. Your Honor, the FLAG class was an intensive articulation and expressive phonology program, for lack of a better term, for SP, and they also had a DHH itinerant, so a deaf-hard-of-hearing itinerant teacher who would assist the speech and language pathologist in monitoring SP's hearing loss into giving particular remedies and strategies to work with SP and to monitor her in the event that her hearing impacted her or began to impact her in a more severe way in order to be able to catch anything that was falling through the cracks. That was the point of that DHH itinerant support. The district's deaf and hard-of-hearing specialist, Carlton, I think, agreed the only way to determine how background noise affects a hard-of-hearing student is through tests by an audiologist. I think that's right, and the district didn't have any auditory-verbal therapists or experts conduct an aided audiogram or other formal hearing tests. Your Honor, as far as that point is concerned, the district had two audiograms that it had information on up to that point. In June 2014, parents had provided an aided audiogram that Sarah Carlton had had an opportunity to review, and then on December 2, 2014, at the IEP meeting, parent provided another audiogram which the IEP team was able to review. In addition, the audiologist... But they agreed that the June test was out of date. They said it would be wise to get an updated one, but I think the important point here is... And the district didn't do anything about any of that. The parents presented one which even you said was inadequate. I'm sorry, Your Honor, which hearing... The parents presented one in December. No, Your Honor, I don't believe that anyone said that that was inadequate. I thought you did. Oh, no, no, no. I believe that it met the requirement of determining the nature range of her hearing loss. I think the primary point is the audiologist that testified stated that the functional hearing could be tested with a speech and language assessment. She was the primary witness on that point, and the district complied with that in that they did their own speech and language assessment. Okay, well, I don't want to take... Oh, no, no, sure. I thought that even per the school district's assessors, she had issues in terms of language that were manifested, both because of natural developmental delays as well as due to her hearing impairment. So doesn't she then meet the definition of hearing impaired and should have been classified as such? That's why I was asking counsel, like, okay, if she had been classified as much, how would the written IEP have been different? But to settle on Judge Reinhart's point, we almost can't, on this record, figure that out because it's a chicken and egg issue. You're saying, well, this program is appropriate for her, but had she been classified as hearing impaired from the get-go, the IEP might have been written differently because the goals and accommodations and services are driven by the appropriate classification in the first place. You're right. I think that... Wasn't her deafness something that impacted her ability to progress? Your Honor, I don't think there's any doubt that her hearing loss impact was impacting her. I think the question is in what way. So when you look at the definitions of both deafness and hearing impairment, you're looking for the degree of impact, and the degree of impact you would expect to see to be more severe. So, for example, Cynthia Gonzalez, who is the DHH teacher who did SP's academic testing, she actually taught a SDC DHH class, and she testified to the extent and impact of those students' hearing loss. So that's a good example as far as looking... How severe does it have to be under the law? I'm looking at the CFR, and it says deafness means a hearing impairment that is so severe that a child is impaired in processing linguistic information through hearing with or without amplification that adversely affects a child's educational performance. So wasn't there an adverse effect on the child's educational performance here? As far as that first prong, Your Honor, is concerned, I think what the team had found was that SP had made month-for-month progress, meaning from the time that she began wearing hearing aids at the age of 3 months, she began making month-for-month progress according to the district testing. So she was showing that she wasn't severely impacted. She was doing very well in regards to her access to her hearing because of that month-for-month progress. In regards to adversely impacting her educational performance, all of the objective testing that the district had done during this process, including adaptive testing, the academic testing, the behavioral testing, demonstrated that her hearing wasn't impacting her adversely in those separate ways. It was impacting her articulation. The practical testing, the practical standard, she seemed to be doing okay, isn't what's really required by the Act. It's really expert testing. And she didn't, as I understand it, have an aided audiogram, which would have tested her hearing in relation to the noise and the levels of that. And that's one of the requirements that at least the other side suggests, is that an aided audiogram, meaning with the hearing aids in, tests your ability to hear in a noisy environment. And that wasn't performed, as I understand it. No, but as the audiologist had testified, Your Honor, it was an aided audiogram or speech and language testing. How do you do speech and language testing? It's pursuant to the code, Your Honor. So under 20 U.S.C. 1414, those mandates are followed, and they choose standardized instruments. They administered this test with essentially it was a speech and language pathologist. It was a school psychologist. It was the parent. It was the student. Ms. Carlton was there. And they administered those standardized tests in a classroom alone. There were no other students there. And then administered those tests in that format. I mean, as I read your witnesses, I mean the school's witnesses' testimony, I didn't think that they were satisfied that there was sufficient testing to really determine. There was to determine the language. And there was knowledge that it was related to the hearing. But there weren't really the kind of hearing tests that would be required if you had considered this child to be a hearing-impaired child. Or the relationship between the hearing and the language. Your Honor, I see my time has run. But to answer your question, I don't believe they felt that there was insufficient testing. I felt that if they could have done anything else, they would have liked to have seen SP in her private preschool setting. But at that point in time, the parent had stated that she was no longer in her private preschool. No, no, I understand. It's not a placement question. But I thought that the school district's witnesses didn't consider that they had done the relationship testing between the hearing and the language difficulty. The observations, I understand what you're saying. She seemed to be doing better when she had the hearing aids. After three months, she was improving. But that there wasn't any testing of the relationship between the hearing and the language difficulty. No audiological, if there is such a word, testing. You know, I probably know less than you do about this. But I had the same feeling that Ted Winn had, that she really wasn't examined as a child with a hearing problem or an examination of the relationship between the hearing and the language problem. She was treated, examined and treated by the district as a child with a language problem. And that was it. Your Honor, if I may just address that. No, no, please. Briefly. Finish, yes. In that situation, I don't think that SP in this particular situation established what that testing should have looked like. I think that what was presented was some private assessments which were presented that were deficient in regards to IDA compliance. But SP never fully established what should that hearing test have looked like. The audiologist testimony is the only thing that we have to go off of in this situation. And that states that, again, either an aided audiogram or speech and language testing, which the district did. Absent that, the record is missing any information on what would that testing look like. And the burden here in this particular case rested with SP. And I would submit then that SP failed to meet the burden in regards to that issue if that were the case. Thank you. Thank you, Your Honor. Thank you for your time, Your Honor. Thank you. If SP were found eligible as a child that was hearing impaired, then the school district, the administrative law judge, and the district court would have focused in, with hopefully laser-like precision, on the special factors that need to be considered for a child with hearing loss. And following those factors, an emphasis would have been placed on the need for her to be in a general education classroom to treat and remediate her hearing loss and to develop her language mode to an appropriate level of proficiency. This is a child. There's a lot of robust disagreement whether the district did the right testing or not. But there's no doubt whatsoever, even with the testing that we believe is subpar, they're saying she's got articulation problems. She doesn't use enough words. She only says one-word sentences and utterances that are not clear. But we know this girl has a problem. The only explanation for it is the hearing, hearing loss, and that was not properly addressed. Now, in terms of what should be done to properly test for that, we start getting into some of the nitty-gritty of what an audiologist is going to do. Some of the tests an audiologist would do would be an aided audiogram. Some of the tests they could do would be a hearing and noise test. And the bottom line is this is a child that had problems well beyond articulation, and they treated her by putting her in an articulation-only class. Any way you look at this, her disability is not being treated. That flag class consists only of children, disabled children, with articulation disorders. Here, SP has phonological processing problems. She also has, as I just mentioned, she's not using enough words and sentences. She's not, her spontaneous language is not as robust as we would expect for a child of this age. And there's nothing that hints at anything in this case that the cause of those problems is anything but her hearing loss. In terms of- Is your contention with respect to the flag class that there was nothing done in that curriculum to address the issue of the hearing impairment interfering with her speech development, that there was nothing at all whatsoever in that flag class? I wouldn't say nothing at all, but such a trivial amount that it's relatively meaningless. The flag class was a class for children with articulation disorders. SP was going to be the only deaf kid in that class. And to treat articulation and SP's other language problems, you need more than just articulation remediation. And you also need to treat it based upon its cause. And in her case, the cause was not hearing it. Whereas the other kids in that class, the cause of their articulation problems is not anything to do with their hearing. It's because they may not know how to place their tongue. They may have certain weaknesses in their mouth in terms of how they formulate words. They're not doing it correctly. So the cause of the problem is completely different. And more importantly, articulation was only one of SP's problems. So I don't know what this flag class is going to do about any of her other issues that the school district recognized she had. And I want to sum up and I want to say that if you look at the IEP on the first page, it has a section where they can give a kid a primary eligibility and a secondary eligibility. And that fits with the EM versus Pajaro Valley case. You can have a kid eligible under more than one category. And this myopic view where her hearing loss problems are not being treated, that goes to the very core of this case and why she was denied an appropriate education. Thank you all very much. Thank you both. It was very educational. And the case disargued will be submitted. The court will stand in recess for the day. All rise.
judges: Reinhardt, Nguyen, Settle